**NOT FOR PUBLICATION**

**FILED**

JAMES J. WALDRON, CLERK

**3/14/2016**

United States Bankruptcy Court
Newark, NJ

By:  /s/ Margaret Cohen, Deputy

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

In re:

JOHN SCULLY,

                          Debtor.

Case No.:    14-12881  VFP

Chapter    7

## MEMORANDUM OPINION

## APPEARANCES

WILLIAM L. PEGG JR., ESQ.
Attorney for Debtor
133 Washington Street
Morristown, NJ  07960

JONATHAN STONE, ESQ.
Attorney for Creditor, Michelle Scully
490 Schooley's Mountain Road, Bldg. 3A
Hackettstown, NJ  07840-4002

JAY L. LUBETKIN, Esq.
Trustee
Rabinowitz, Lubetkin & Tully, LLC
293 Eisenhower Parkway, Ste. 100
Livingston, NJ  07039

**VINCENT F. PAPALIA, Bankruptcy Judge**

## I.      INTRODUCTION

This matter originally came before the Court on the motion (the "Claim Motion") of Debtor John V. Scully (the "Debtor") through counsel William L. Pegg, Jr., Esq. ("Pegg") filed on October 1, 2015 on shortened time to prevent Chapter 7 Trustee Jay Lubetkin (the "Trustee") from delivering a final distribution check to Debtor's former spouse, Michelle Scully ("Michelle") until the Court could determine the "efficacy" of her proof of claim No. 4-1 filed on April 22, 2014 (the "Claim").  Debtor filed the Claim Motion *after* the Court had entered the *Order Awarding Trustee's Compensation and Expenses* on September 28, 2015 (the "September 28 Distribution Order") (Dkt. No. 49) and after the Trustee had prepared his distribution checks.[1] As a result, the Debtor's Claim Motion was treated by this Court as both an objection to Michelle's proof of claim under Fed. R. Bankr. P. 3007 and a motion for reconsideration of the September 28 Distribution Order under Fed. R. Bankr. P. 9024.

Michelle's Claim arises from the parties' matrimonial proceeding in Superior Court of New Jersey, Chancery Division, Family Part, Morris County (Dkt. No. FM-14-86-13).  The basis of the dispute is Debtor's assertion either that he already paid the amounts demanded in the Claim or that the Superior Court denied Michelle's demand for these payments against Michelle's assertion that the amounts in the Claim remain due and owing under Superior Court Orders.

As a result of Debtor's initial application, the Court on October 2, 2015 entered an Order compelling the Trustee to hold his distribution checks to Debtor ($6,736.47) and to Michelle ($36,573.95) pending further Order of this Court.  *See* Dkt. No. 53. The Court held hearings on

---

[1] Debtor did not object to the Claim or to the Trustee's proposed distribution before the Court entered the September 28 Distribution Order.

October 27, 2015 and on December 1, 2015 and required both Debtor and Michelle to file additional submissions, some of them pursuant to an *Interim Order on Debtor's Motion to Enjoin the Chapter 7 Trustee from Making Any Distribution to Michelle Scully* (the "Interim Order") entered on December 10, 2015 after the last hearing in the matter (Dkt. No. 74). In the course of these submissions, Michelle filed an amended proof of claim on November 15, 2015 (Claim 4-2) and further amended her demand in her post-hearing submissions at Dkt. Nos. 73 and 77.

The Court required the parties to provide additional submissions in an effort to clarify, organize and complete the previous filings made by the parties, which resulted in a confused, incomplete and frequently changing record. Unfortunately, that record, while now better, remains less than clear and organized and may still not be complete, although it is now closed for purposes of these proceedings. As a result, the Court will summarize and, hopefully, clarify the state of the record here, as limited by the noted constraints.[2]

The Interim Order made (and/or confirmed from the October 27 and December 1 hearings) the following significant procedural and substantive findings, which are repeated here to clarify the narrative (and not to supersede the Interim Order):

(1) The Court treated Debtor's application as a motion for reconsideration of the September 28, 2015 Distribution Order;

(2) The Court treated Debtor's application as an objection to Michelle's proof of claim;

(3) The Court allowed Michelle to file her amended proof of claim, Claim 4-2;

---

[2] Courts are not expected to organize parties' data. *In re Meade Land & Dev. Co., Inc.*, 577 F.2d 858, 860 (3d Cir. 1978) (in the context of fee applications) ("[a]ttorneys should not expect the Court to tabulate . . . from masses of raw data such as boxes of records or correspondence"); *In re Hughes*, 873 F.2d 262, 264 (11th Cir. 1989) (in the context of an adversary complaint to deny discharge under 11 U.S.C. §§ 727(a)(3) (recordkeeping) and 727(a)(5) (failure to explain loss of assets) (after the Debtor gave the bankruptcy court "a jumbled mass of reports, miscellaneous papers, invoices and other raw data urging that, when properly studied and organized these would adequately reflect the status" of Debtor's affairs, the Eleventh Circuit observed that the Debtor "may not simply place tow sacks of records before the bankruptcy judge and request the judge to sift through the documents and attempt to reconstruct the flow of the debtor's assets").

(4) The Court found that all payment obligations due Michelle under Claim 4-2 are Domestic Support Obligations ("DSO") under 11 U.S.C. § 101(14A) and are excepted from discharge under 11 U.S.C. § 523(a)(5);

(5) The Court found that all payment obligations due Michelle under the parties' Marital Settlement Agreement ("MSA") are excepted from discharge either under 11 U.S.C. § 523(a)(5) as DSO or under 11 U.S.C. § 523(a)(15) if the obligations are not considered to be DSO (Dkt. No. 51-3, Debtor's Cert., Ex. 5); and

(6) The Court found that Michelle's post-petition Superior Court motion practice, in which the Debtor participated, did not violate the automatic stay under 11 U.S.C. § 362(a).

(Dkt. No. 74, Interim Order, ¶¶ 1, 2, 6).

The remaining issue for this Court is to determine the amounts due Michelle on Claim 4-2 based on the parties' proofs. Having considered all submissions of the parties, the Court allows Michelle's Proof of Claim 4-2 in modified amounts as set forth below, representing the amounts which the Court finds due as of the February 19, 2014 petition date.

## II.    JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b) and the Standing Orders of Reference entered by the United States District Court on July 10, 1984 and amended on October 17, 2013. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (I) and (O). Venue is proper in this Court under 28 U.S.C. § 1408. The Court issues the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052. To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

## III.    FACTS AND PROCEDURE

### A.    **Prepetition Matrimonial Practice**

The following summary of the parties' matrimonial proceedings provides the background

for Michelle's Claim.  On July 17, 2012, the Debtor filed a matrimonial complaint captioned *John Scully v. Michelle Scully*, Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Dkt. No. FM-14-86-13 (Dkt. No. 68-1, Michelle's Cert., Ex. A). Attached to the Complaint was the parties' Matrimonial Settlement Agreement signed by each party on July 17, 2012 ("MSA") (Dkt. No. 68-1, Ex. A). The Complaint demanded divorce from bed and board and equitable distribution.  On September 5, 2012, the Superior Court granted the parties a Judgment of Divorce from Bed and Board, which incorporated the MSA and acknowledged that the Court had taken no testimony regarding the MSA (Dkt. No. 68-1, Ex. A) (the "September 5, 2012 Judgment").[3]  The parties entered the MSA *pro se* (though the Debtor is a lawyer) and remained *pro se* through the entry of the September 5, 2012 Judgment.

The MSA acknowledged that Debtor and Michelle held joint title to two real properties: 81 Lee Drive, Modoc, South Carolina (the "South Carolina Property") and 24 Tulip Avenue, Budd Lake, New Jersey (the "Residence") (Dkt. No. 68-1, Ex. A, MSA, § 1).   The MSA allowed both Debtor and Michelle to live at the Residence and to remain on the title of both properties for five (5) years after which time Michelle would become sole owner of the Residence, and Debtor would become sole owner of the South Carolina Property (Dkt. No. 68-1, Ex. A, MSA ¶ 1).  If Debtor elected at the end of five (5) years to sell the South Carolina Property, then Michelle "*shall agree to the sale and will not be entitled to any remaining profits*" (Dkt. No. 68-1, Ex. A, ¶ 1) (emphasis supplied).

In relevant part the MSA also provided that, "[*i*]*n lieu of alimony until July 17, 2022, when alimony commences under ¶ 7*" (emphasis supplied), Debtor would, for the first five years, pay the actual following expenses for the Residence, which are listed here to match the order listed in

---

[3] The parties were granted an absolute divorce by Superior Court Order entered on October 4, 2013 (Dkt. No. 72, Ex. D, Order at pp. 13, ¶ 4).

Claim 4-2:

           1st Mortgage (and real estate taxes)
           2nd Mortgage
           Home Equity Line of Credit
           Car insurance (hers)
           Homeowners insurance
           Electric bill (capped at $400/mo.)
           TV (capped at $50/mo.) / Phone (capped at $225/mo.)
           Water/Sewer

(Dkt. No. 68-1, Ex. A, MSA, ¶ 1). From the sixth through the tenth year, the MSA stated that Debtor's contribution to these expenses would not exceed $2,500 per month and would end on July 17, 2022 (Dkt. No. 68-1, Ex. A, MSA, ¶ 1). The above expenses paid by the Debtor were to be nontaxable to Michelle. Michelle was to be responsible (from the outset) for all other expenses of the Residence not paid by the Debtor (Dkt. No. 68-1, Ex. A, MSA, ¶ 1). The MSA, ¶ 7, required Debtor to begin making alimony payments of $2,500 per month on the earlier of (1) the sale of the Residence; or (2) July 17, 2022 and to continue to pay for the life of Michelle subject to reduction only if his pension were reduced (Dkt. No. 68-1, Ex. A, ¶ 7). Debtor was also to pay the balance due on two jointly held credit card debts, $7,500 to Bank of America and $6,400 to Citibank (Dkt. No. 68-1, Ex. A, ¶ 3).

Between the entry of the September 5, 2012 Judgment and the filing of the Chapter 7 petition on February 19, 2014 (and beyond), the parties engaged in a sequence of Superior Court enforcement actions, which generated various and numerous Orders on October 4, 2013 (five Orders); January 13, 2014 (two Orders); and postpetition on March 31, 2014 (two Orders). These are filed at Debtor's Dkt. No. 72,[4] under Ex. D, are referenced hereafter by Exhibit page number, Order page number, and paragraph number where applicable and are

---

[4] The main document at Dkt. No. 72 is closer in format to an uncertified letter with unnumbered paragraphs from Mr. Pegg (hereinafter referred to as "Debtor doc.").

relevant to the demands in Michelle's Claim 4-2.   Debtor's Superior Court applications included a demand to vacate the MSA, which was not granted (Dkt. No. 72, Ex. D, October 4, 2013 Order at pp. 15-29, Statement of Reasons, p.6).

### B.  **The Bankruptcy Case**

The Debtor ( through counsel, William L. Pegg, Jr., Esq. ("Pegg")) filed this Chapter 7 bankruptcy case on February 19, 2014 (the "Petition Date").   Debtor scheduled Michelle as a creditor on "F" for $6,000 arising from the Citicard debt (Dkt. No. 1).   On March 25, 2014, the Trustee filed a Notice of Assets labeled "Equity in real property" (ultimately identified as the South Carolina Property), and the claims bar date was set at June 23, 2014 (Dkt. No. 8).

Michelle timely filed proof of claim 4-1 on April 22, 2014 for $36,509.97 identified as "domestic support obligation" under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B) (according to the boilerplate checked on the claim form) ("Claim 4-1").   Claim 4-1 consisted of a schedule of debts totaling $36,509.97 with no supporting documents.   The schedule is set forth in Column 1 of the attached Appendix 1 ("Claim 4-1").

The Debtor received his discharge on May 23, 2014.   On June 10, 2014, the Trustee, Debtor (through Pegg) and Michelle entered a *Stipulation and Consent Order* which facilitated the Trustee's marshaling the real property of the estate *and which conformed to the parties' intentions in the MSA* (the "Stip") (Dkt. No. 23).   Both the MSA and the Stip provided (1) that Michelle waives all claims to the South Carolina Property or its proceeds, and (2) that Debtor waives all claims to the Residence or its proceeds (Dkt. No. 51-4, Ex. 5; Dkt. No. 23).   The Stip merely accelerated the actual transfer of title of the South Carolina Property to Debtor and of the Residence to Michelle.

The Court entered an Order on November 12, 2014 authorizing the Trustee to sell the South Carolina Property to a third party for $86,000 (Dkt. No. 31), and on December 4, 2014

7

the Trustee abandoned the Residence (Dkt. No. 33) (Certification of No Objection to Abandonment docketed on December 19, 2014) (Dkt. No. 35). The Trustee challenged and expunged only one claim (secured by a motor vehicle which the Trustee did not administer) (Dkt. Nos. 36, 37, 40).

On August 21, 2015 and August 27, 2015, the Trustee filed his *Final Report and Application for Compensation* (the "TFR") (Dkt. Nos. 45 and 47). The estate consisted of only the $86,000 realized from the sale of the Property ($87,080.36 including interest) from which the Trustee paid $11,306.74 in closing costs and bank fees before netting $75,773.62 for final distribution. The Trustee paid $19,977.73 in Trustee's commissions, attorney's fees and expenses leaving a balance of $55,795.89 to creditors. The TFR proposed to distribute that balance as follows:

| Claimant | Amount | Status |
|---|---|---|
| Michelle Scully | $36,509.97 | allowed priority claim |
| General unsecured creditors (timely filed) | $12,464.63 | 100% recovery |
| John V. Scully | $ 6,821.29 | refunded to Debtor |

(Dkt. No. 45, TFR, p.11) (there were no tardily filed general unsecured creditors). Notice of the hearing on the TFR, scheduled for September 22, 2015 at 2:00 p.m., was served on the Debtor by the Bankruptcy Noticing Center by first-class mail on August 27, 2015 (Dkt. No. 48, BNC Certificate of Notice). Debtor's counsel received electronic notice of the TFR and of the September 22, 2015 hearing. Debtor filed no objection to the TFR. On September 28, 2015, the Court entered the *Order Awarding Trustee's Compensation and Expenses,* which also approved the Trustee's distribution set forth above (Dkt. No. 49). The Debtor filed the instant motion on October 1, 2015.

Michelle filed her Amended Proof of Claim on November 15, 2015 (Claim 4-2). Her revised demand is set forth in Column 2 of the attached Appendix 1 ("Claim 4-2") (Claim 4-2

includes certain supporting documents and was also filed as an attachment to Michelle's Dkt.

No. 68-1).  In response to the Court's request for additional submissions, Michelle filed, among

other papers, Dkt. Nos. 73 and 77 (which are identical and are referenced as "Dkt. No. 77").  The

demand in Dkt. No. 77 is summarized at Column 3 of the Appendix 1 ("Dkt. No. 73/77").  The

Debtor filed, among other papers, Dkt. Nos. 67 and 72.  The Debtor's positions in Dkt. Nos. 67

and 72 are summarized at Column 4 of the attached Appendix 1 ("Dkt. No. 67/72").

## IV.    ANALYSIS OF THE PARTIES' PROOFS

Prior to analyzing the parties' proofs, the Court will address an issue that seems to have

resulted in Michelle substantially increasing her demand to $76,780.68 in her last submission.

(Dkt. No. 77).  That amount appears to be based on Michelle's Claims against the Debtor accruing

both pre- *and* post-petition.  However, the Debtor's estate consists only of property interests as of

*the commencement of the case* on the Petition Date, i.e., February 19, 2014.  *See* 11 U.S.C.

§ 541(a).  Similarly, claims against the Debtor's estate, including claims such as Michelle's, are

based on the amount due *as of the Petition Date*.  In other words, like property of the estate, a

"claim" against the estate is also limited to the amount of the creditor's claim *as of the Petition

Date*.  *See, e.g.,* Official Form 10 in effect when this case was filed (requiring creditor to provide

"Amount of Claim as of Date Case Filed").[5]

Thus, although this Court held (among other things) that the Debtor's obligations to

Michelle under the MSA are nondischargeable, that does not mean that Michelle's Claims against

the Debtor's *estate* include all of her pre- *and post-* petition claims.  Instead, Michelle's Claims

against the Debtor's estate are limited to the amount of her Claims as of the Petition Date, rather

than through the present, as Michelle's latest proofs seem to have asserted.  Notwithstanding this

---

[5] The instructions for new Official Form 410 also make clear that a creditor's claim against the estate is limited to amount the Debtor owed on the Petition Date.

determination as to the amount of Michelle's Claim against, and what she may recover from, the

Debtor's estate, Michelle has the right to seek recovery on her *post*-petition claims directly against

the Debtor, as they are nondischargeable, as was previously held by this Court.  She is not,

however, entitled to receive any distribution from the Debtor's *estate* on her *post*-petition claims

against the Debtor.  That recovery would be from the Debtor's post-petition assets.  Thus, the

distinction between pre- and post-petititon claims and assets of the estate is crucial to this analysis

and Opinion.  With that background, the Court will analyze the *pre*petition components of

Michelle's claims against the estate and the Debtor's defenses and objections to those claims.

      1.    <u>Bank of America ("BoA") First Mortgage (including tax)</u>.  The MSA requires the

Debtor to make the first mortgage payments (Dkt. No. 68-1, Ex. A, ¶ 2).  Michelle's demand

increased from $15,822.71 in Claim 4-1 and 4-2 to a demand of $76,780.68 (Dkt. No. 77,

Michelle's Cert., Ex. I). Exhibit I is an undated screen print from Caliber Home Loans showing a

past due amount of $76,780.68 and the title "Last Payment Date 01/06/14; Next Payment Date

12/10/13" (Dkt. No. 77, Michelle's Cert., Ex. I). As noted above, the increase to $76,780.68 is

apparently based on Michelle's inclusion of all pre- and post-petition amounts due on the first

mortgage and is not proper.  Instead, the Claim (and any defenses) will be analyzed as of the

Petition Date.

      As to the amount due as of the Petition Date, the Debtor provided a statement dated

January 21, 2014 from Bank of America Home Loans showing $9,415.71 due (at $3,188.57 per

month) on February 10, 2014,  just before the February 19, 2014 Petition Date (Dkt. No. 72,

Debtor doc., Ex. B-3).  According to Debtor's Ex. B-3, an escrow for tax and insurance is included

in the monthly payment.  Michelle has also attached the January 21, 2014 statement to her

submission at Dkt. No. 77, Ex. I (notwithstanding her reliance on the undated and apparently

outdated statement from Caliber Home Loans).  Based on the close proximity of the February

10th statement to the Petition Date, the Court finds that Debtor's estate owes Michelle **$9,415.71** for *prepetition* arrears on the first mortgage due BoA Home Loans.[6]

2.    <u>Bank of America (BoA) Second Mortgage</u>.  The MSA requires the Debtor to make the second mortgage payments (Dkt. No. 68-1, Ex. A, ¶ 2).  Michelle's demand increased from $2,651.35 in Claim 4-1, to $3,438.02 in Claim 4-2, to $14,687 in Dkt. No. 77 (Dkt. No. 77, Michelle's Cert., Ex. F).  This latest increase is again apparently attributable to the improper inclusion of post-petition amounts due, as noted above and as evidenced by the fact that Michelle's last demand is based on a *payoff statement* good through January 1, 2016.  Debtor responds with a statement dated January 27, 2014 from Bank of America Home Loans showing $1,864.68 due (at $786.67 per month) on February 17, 2014, just before the February 19, 2014 Petition Date (Dkt. No. 72, Debtor's doc., Ex. C-2).  The Court accordingly finds that Debtor's estate owes Michelle **$1,864.68** for *prepetition* arrears on the second mortgage due BoA Home Loans.

3.    <u>Home Equity Line of Credit</u>.  The MSA requires the Debtor to pay the home equity line of credit for Michelle (Dkt. No. 68-1, Ex. A, MSA, ¶ 2).  Michelle reduced her demand from $363.74 in Claim 4-1 to $0 in Claim 4-2.  This claim remained at $0 in Dkt. No. 77, p.7, ¶ 10.  Thus, Michelle is apparently not seeking prepetition arrears on the home equity line of credit as a component of Claim 4-2.  The Court accordingly finds that Debtor's estate owes Michelle **$0** for *prepetition* amounts due on the home equity line of credit.[7]

---

[6] In making these rulings, and as noted above, the Court's award against the Debtor's estate is expressly and necessarily limited to the assets of the Debtor's estate as of the Petition Date and Michelle's Claims against the estate, as calculated on the Petition Date.  As was also noted above, this ruling does not in any way limit or affect Michelle's right to seek recovery of post-petition nondischargeable amounts due from the Debtor and from the Debtor's post-petition, nonestate assets, which obligations remain in effect and may be enforced by Michelle in Superior Court.

[7] For this and for any subsequent item for which Michelle reduced her claim to $0 in Dkt. No. 77, the Court has not analyzed whether she was entitled to it under the Superior Court Orders, but presumes that she has abandoned the item only as an element of the Proof of Claim.

11

4.  Car Insurance.  The MSA requires the Debtor to pay car insurance for Michelle (Dkt. No. 68-1, Ex. A, MSA, ¶ 2).  Michelle reduced her demand from $1,346.29 in Claim 4-1 to $0 in Claim 4-2 and in Dkt. No. 77, p.7, ¶ 10).  Thus, Michelle is apparently not seeking prepetition arrears for car insurance as a component of Claim 4-2.  The Court accordingly finds that the Debtor's estate owes Michelle **$0** for *prepetition* amounts due for car insurance.

5.  Homeowner's Insurance.  The MSA requires the Debtor to pay homeowner's insurance for Michelle (Dkt. No. 68-1, Ex. A, MSA, ¶ 2).  Michelle increased her demand from $276.34 in Claim 4-1 to $365.42 in Claim 4-2.  It remained at $365.42 in Dkt. No. 77, p.7, ¶ 10).  The only documentary evidence provided by Michelle for the amount due near the February 19, 2014 Petition Date is a February 27, 2014 e-mail from the carrier stating that payment of $276.34 would be processed on February 27th  (Claim 4-2, Ex. N) (no relevant exhibit is attached to Michelle's subsequent Dkt. No. 77).  Also attached to Exhibit N are (1) a ledger showing withdrawals from Michelle's checking account to the carrier from March 24, 2014 through June 27, 2014; and (2) a statement dated June 21, *2013* from the carrier.  Exhibit L also shows a withdrawal from Michelle's checking account to the carrier on March 24, 2014.  Michelle has provided no document to substantiate a balance of $365.42 (as opposed to $276.34) due on the Petition Date.

Debtor's counsel argues (1) that homeowner's insurance was included in the mortgage; and (2) that the March 31, 2014 Enforcement Order, paragraph 7, "addressed and disposed" of this issue (Dkt. No. 67, Debtor's doc., p.4).  The March 31, 2014 Enforcement Order at paragraph 7 states:  "[Michelle's] application for an award of unreimbursed expense is denied without prejudice" (Dkt. No. 72, Ex. D, March 31, 2014 Order at pp. 40-43, ¶ 7).  First, "application" in this paragraph at least impliedly refers to the motion which generated that Order.  Second, and more importantly, Debtor's opportunistic reliance on ¶ 7 is undermined

12

by the Superior Court's clear order in ¶ 9 that the Debtor continue to pay Michelle's expenses under the MSA:

> 9.    [Michelle's] application for an Order compelling [Debtor] to render current all arrears in house/mortgage/utilities/sewer/water/*homeowners insurance* and other such expenses [Debtor] agreed to pay in the MSA is granted.  [Debtor] shall provide proof of continuous payment of said expenses on an ongoing basis.

(Dkt. No. 72, Ex. D, Order at pp. 40-43, ¶ 9) (emphasis supplied).  This Order plainly compels the Debtor to pay homeowners insurance on an ongoing basis.  Thus, notwithstanding the apparent inclusion of homeowner's insurance in the mortgage payment, Debtor has provided no proof that he has paid the $276.34 prepetition balance for homeowner's insurance substantiated by Michelle and paid by Michelle as a "one time payment."  (*See* Ex. N). The Court finds that Debtor's estate owes Michelle **$276.34** for *prepetition* arrears on the homeowner's insurance.

6.    <u>TV/Telephone/Electricity</u>.  The MSA requires the Debtor to pay the electric bill (up to $400/mo.); the cable bill (up to $50/mo.) and the telephone bill (up to $225/mo.) (Dkt. No. 68-1, Ex. A, MSA, ¶ 2).  Michelle increased her demand from $750 for TV/Phone in Claim 4-1 to $900 for "Utilities" in Claim 4-2 to a three-part demand in Dkt. No. 77 for "Utilities" ($900); Electric ($580.81); and Optimum ($104.77) (Dkt. No. 77, p.7, ¶ 10).

As to $900 for "Utilities," Michelle's demand is supported by an apparently custom-printed bank statement showing *semi-monthly* payments to Verizon of uneven amount for three months from August 2013 through October 2013 (Claim 4-2, Ex. F, Verizon bank credits (the "Verizon Statement") (p.2), plus invoices from Verizon and from Verizon Wireless).  Michelle's handwritten note on the Verizon Statement says that one payment per month is for TV/Phone and the other is for a cell phone.  Because these payments to Verizon exceed $225 per month, Michelle has capped her demand for August through October 2013 at $225/mo. (a total of $675).  A notation on the Verizon Statement anticipates paying Verizon

at least $225 in November 2013, and that projection is supported by actual bills showing $166.50 due Verizon Wireless for the October 23-November 22, 2013 period and $133.91 due Verizon (TV/Phone) on a statement dated November 8, 2013 (Claim 4-2, Ex. F, pp. 11, 15) (Claim 4-2, Ex. F, p.11 shows the last actual payment, $226.82, on the Verizon Statement, Ex. F, p.2, and, therefore, shows continuity between the Verizon Statement and Michelle's anticipated November 2013 payments).  Michelle, therefore, has supported her demand for **$900** in "Utilities" (specifically, the Verizon bills) capped at $225 per month as required by the MSA.[8]

As to $580.81 for Electric and $104.77 for Optimum, the Superior Court in the October 4, 2013 *Order on Notice of Motion Returnable July 26, 2013* ordered the Debtor to reimburse Michelle $580.81 for the Electric bill and $104.77 for the Optimum bill (Dkt. No. 72, Debtor's doc., Ex. D, October 4, 2013 Order at pp. 5-8, ¶¶ 3, 5).[9]  Because these demands were included in a motion originally returnable before Michelle made any payments on the Verizon Statement, this Court finds that *none* of these payments should be further reduced by the $225 per month cap.

Debtor argues, as he did regarding homeowner's insurance, that he is not obligated to pay TV/Phone because the March 31, 2014 Enforcement Order, paragraph 7, "addressed and disposed" of this issue (Dkt. No. 67, Debtor's doc., p.4).  The March 31, 2014 Enforcement Order at paragraph 7 states:  "[Michelle's] application for an award of unreimbursed expense is denied without prejudice" (Dkt. No. 72, Ex. D, March 31, 2014 Order at pp. 40-43, ¶ 7).  As stated above, Debtor's opportunistic reliance on this paragraph is undermined by the

---

[8]Under the MSA, Michelle could cap TV plus telephone at $275/mo., but this was not part of Michelle's demand.

[9] The Superior Court also ordered Debtor to reimburse Michelle for the $104.77 Optimum bill in another October 4, 2013 *Order on Notice of Motions and Cross Motion Returnable August 9, 2013* (Dkt. No. 72, Ex. D, pp. 9-12, ¶ 8.

14

Superior Court's clear order in paragraph 9 that the Debtor continue to pay Michelle's expenses under the MSA:

> 9.    [Michelle's] application for an Order compelling [Debtor] to render current all arrears in house/mortgage/*utilities*/sewer/water/homeowners insurance and other such expenses [Debtor] agreed to pay in the MSA is granted. [Debtor] shall provide proof of continuous payment of said expenses on an ongoing basis.

(Dkt. No. 72, Ex. D, Order at pp. 40-43, ¶ 9) (emphasis supplied). This Order plainly compels the Debtor to pay Michelle's documented demand of $900 for Utilities; $580.81 for Electric; and $104.77 for Optimum and in no way relieves him of this obligation. Debtor has not provided proof that he has made these payments. The Court finds that Debtor's estate owes Michelle **$1,585.58** ($900 + $580.81 + 104.77) for *prepetition* Utilities, Electric and Optimum as demanded in Claim 4-2 and in Dkt. No. 77.

7.    <u>Water Bill</u>. The MSA requires the Debtor to pay "all municipal water and sewer bills" (Dkt. No. 68-1, Ex. A, MSA, ¶ 2). Michelle increased her demand from $128.87 for the Water Bill in Claim 4-1 and Claim 4-2 to $368 in Dkt. No. 77, p.7 ¶ 10). Attached to Claim 4-2 is an estimated bill from Mount Olive Township Water Utility for $128.87 (with no arrears) dated March 5, 2014 (shortly after the February 19, 2014 Petition Date). Michelle has not substantiated a demand for $368 prepetition.

As with the other utility payments, Debtor argues that he is not obligated to pay the Water Bill because the March 31, 2014 Enforcement Order, paragraph 7, "addressed and disposed" of this issue (Dkt. No. 67, Debtor's doc., p.4) (Dkt. No. 77, Ex. D, March 31, 2014 Order at pp. 40-43, ¶ 7). As stated above, the March 31, 2014 Enforcement Order, ¶ 9, clearly ordered the Debtor to bring "sewer/water" arrears current and to provide continuous proof of such payment. Debtor has not provided proof that he has paid the March 5, 2014 bill provided by Michelle. The Court finds that Debtor's estate owes Michelle **$128.87** for the Mount Olive

Township *prepetition* Water Utility bill.

8.    <u>Counsel Fee to Faith A. Ullmann & Associates, LLC</u>.    In the first set of

Enforcement Orders entered on October 4, 2013, the Superior Court ordered the parties to

mediation with a retired Superior Court Judge (Dkt. No. 77, Ex. D, Order at pp. 3-4, ¶ 1) (the

"Mediation Order").    As noted above, Debtor (among other forms of relief requested) sought

to set aside the MSA (Dkt. No. 72, Ex. D, Order at pp. 18-29, p.20/3, ¶ 2).    In a companion

October 4, 2013 Order (in the Statement of Reasons), the Superior Court analyzed each party's

demand for counsel fees and concluded:

> At this stage it is abundantly clear that the [Debtor] enjoys a much better
> financial status than [Michelle].  Since it is the [Debtor] seeking to set aside
> the MSA, the court has determined it will be his responsibility to fund the
> litigation.

(Dkt. No. 77, Ex. D, Order at pp. 15-29, Statement of Reasons, p. 29/12). [10] The Superior

Court in the third of five Orders entered on October 4, 2013 ordered the Debtor to pay

Michelle's counsel, Faith A. Ullmann & Associates, LLC ("Ms. Ullmann"), $10,000 within

thirty days "representing [Michelle's] legal fees and costs with respect to [Michelle's] Notice

of Motion" (Dkt. No. 72, Ex. D, Order at pp. 5-8, ¶ 13) (the "Fee Award" or the "$10,000

Counsel Fee").    The Court's handwritten notation beneath the Fee Award states, "payment of

Legal Fees is a condition of mediation" (Dkt. No. 72, Ex. D, Order at pp. 5-8, p.8).    The

October 4, 2013 Mediation Order compelled Debtor to pay the mediator's fees and expenses

"without prejudice," and reiterated, "[*a*]*s a condition precedent* to post judgment economic

mediation, [Debtor] is required to pay the legal fees and the mediation fees" (Dkt. No. 72, Ex.

D, Order at pp. 3-4, ¶¶ 2, 4) (emphasis supplied).

Michelle, through Claim 4-1, Claim 4-2, and Dkt. No. 77, has consistently demanded

---

[10] Page 12 is the relevant page number in the Order itself.

inclusion of the $10,000 Counsel Fee in the proof of claim (Dkt. No. 77, p.6, ¶ 10).  Michelle

acknowledges that mediation never occurred (Dkt. No. 77, p.6, ¶ 10).  Debtor has consistently

argued *with no support* from the Superior Court Orders -- which he misreads in a self-serving

manner -- that his obligation to make this payment was suspended or superseded by the

parties' failure to attend mediation (Dkt. No. 72, Debtor's doc., pp. 5-6).  Debtor points to no

Superior Court Order which vacated or suspended the $10,000 Fee Award.

Debtor misconstrues the statements in the Superior Court's October 4, 2013 Orders

("[*a*]*s a condition precedent* to post judgment economic mediation, [Debtor] is required to

pay the legal fees and the mediation fees") (emphasis supplied) (Dkt. No. 72, Order at pp.

3-4, ¶ 4); and "payment of legal fees is a condition of mediation") (Dkt. No. 72, Order at pp.

5-8, p.8) to mean their opposite -- that Debtor does not have to pay counsel fees because the

parties have not mediated (Dkt. No. 72, Debtor doc., pp. 5-6).

Debtor then incorrectly cites a January 13, 2014 Superior Court Order, entered on a

motion for reconsideration filed by his own counsel, Tanya Helfand, Esq. (Dkt. No. 72, Ex.

D, p.30).  Reconsideration is denied therein, *and the remaining two forms of relief requested

by the Debtor are denied and stricken, yet Debtor reads the first as if it were granted* (Dkt.

No. 72, Ex. D, p.30).  Paragraph 2 of the January 13, 2014 Order denying reconsideration

reads:

> 2.   ~~Each party shall pay his or her own legal fees for the motions and
> for ongoing mediation~~; *Denied*

(Dkt. No. 72, Ex. D, p.30).  In Debtor's interpretation, this stricken paragraph is revived and

becomes the opposite of what it says ("[e]ach party shall pay his or her own legal fees for the

motions and for ongoing mediation") (Dkt. No. 72, Debtor doc., p. 5) and a basis for negating

his obligation under the October 4, 2013 Order to pay the $10,000 counsel fee.

Debtor pointedly reads out of context a Statement of Reasons appended by the Superior Court to the January 31, 2014 Enforcement Order:

> The efficacy of [Michelle's] other applications pertaining to the MSA will be determined after the parties attend mediation as ordered.

(Dkt. No. 72, Ex. D, Order at pp. 31-38, Statement of Reasons, p.4) as "readdressing" the $10,000 Fee Award and relieving his obligation to pay it (Dkt. No. 72, Debtor doc., p.6). To the contrary, the succeeding sentence is:

> [Debtor] is not relieved of his obligation to fund the litigation.

(Dkt. No. 72, Ex. D, Order at pp. 31-38, Statement of Reasons, pp. 4-5) (emphasis supplied). Debtor's counsel concludes by asking the Bankruptcy Court to "remand" the $10,000 Fee Award to Superior Court (Dkt. No. 72, Debtor doc., p.6), even though counsel previously stipulated on the record on October 27, 2015 that the Bankruptcy Court could liquidate Michelle's proof of claim without further recourse to Superior Court.  The Court finds that the **$10,000** Fee Award is due and payable from Debtor's estate and is an element of Claim 4-2.

9.    "Payments made" by Michelle.  Michelle's demand in Claim 4-1 for $4,168.05 for "payments made" did not appear as a line item in Claim 4-2 or in Dkt. No. 77, ¶ 10.  The Court accordingly finds that Debtor's estate owes Michelle **$0** for *prepetition* amounts due on the $4,168.05 "payments made."

10.    2012 Tax Refund.  Michelle included a claim for $808.54 for a 2012 tax refund in Claim 4-1, reduced to $0 in Claim 4-2 and in Dkt. No. 77, p.7, ¶ 10.  The Court accordingly finds that Debtor's estate owes Michelle **$0** for *prepetition* amounts due on the 2012 Tax Refund.

11.    Old Fee (Overdraft Fee).  Michelle has consistently claimed from Claim 4-1 through Claim 4-2 to Dkt. No. 77, p., ¶ 10, that the Debtor owes her $105 on an old overdraft

fee at Bank of America.  The Superior Court by *Order on Notice of Motion Returnable July 26, 2013* entered on October 4, 2013 expressly ordered the Debtor to reimburse Michelle $105 for the overdraft fee (Dkt. No. 72, Debtor's doc., Ex. D, pp. 5-8, October 4, 2013 Order, ¶¶ 3, 5).[11]

The Debtor argues (Dkt. no. 67, p.4) that the Superior Court "addressed and disposed" of this issue in the March 31, 2014 Enforcement Order (Dkt. No. 72, Ex. D, Order at pp. 40-43, ¶ 12).  The Debtor points to the Enforcement Order, paragraph 12, which states:

> All other financial issues relative to the claims of the litigants relative to the enforcement of their marital settlement agreement and all issues raised by in [sic] the motion and cross motion, *unless otherwise determined by this Court*, shall be submitted to the Post Judgment Early Settlement Panel (See companion order).

(Dkt. No. 72, Ex., Order at pp. 40-43, ¶ 12) (emphasis supplied).  The Superior Court's Statement of Reasons, attached, indicates that the Court denied certain other relief requested by the Debtor, but did rule on Michelle's demands not included in the MSA, and sent the parties again to mediation to try to resolve their disagreements. The companion Order did indeed order the parties back to mediation (Dkt. No. 72, Ex. D, *Order for Post Judgment ESP* ["Early Settlement Panel"] at p.39).  Nothing in the March 31, 2014 Orders or Statement of Reasons indicates that the Superior Court vacated or suspended the Debtor's obligation to pay the $105 overdraft fee awarded to Michelle in both October 4, 2013 Orders; indeed, the March 31, 2014 Enforcement Orders sends the parties' issues to mediation "unless otherwise determined by the Court," and the payment of the Overdraft Fee was already subject to two Orders of the Superior Court.  Accordingly, the Court finds that Debtor's estate owes **$105** for the Overdraft Fee.

---

[11] The Superior Court also ordered Debtor to reimburse Michelle for the $105 overdraft fee in another October 4, 2013 *Order on Notice of Motions and Cross Motion Returnable August 9, 2013* (Dkt. No. 72, Ex. D, pp. 9-12, ¶ 14).

12. <u>Citibank Credit Card</u>.  Michelle's demand for payment on a Citibank credit card (the "Credit Card") increased from $0 in Claim 4-1 to $2,000 in Claim 4-2 and then decreased to $1,656.85 in Dkt. No. 77, p.6, ¶ 10.  The MSA, paragraph 3, acknowledged that Debtor and Michelle were jointly liable on a certain Citibank Credit Card ending in *1991; that it had a balance of $6,400; and that Debtor would be solely responsible for paying it.   The Certification, which Michelle filed in support of her Amended Claim 4-2 on November 15, 2015, opined that the Citibank Credit Card has a balance of "approximately $2,000.00," but neither the Certification nor Claim 4-2 contained any supporting documentation or explained as of what date that $2,000 accrued (Dkt. No. 68-1, Michelle Cert., ¶ 7 and Claim 4-2).

Measuring his payments against Michelle's approximated $2,000 balance, Debtor claims that he paid $2,292.62 through May 7, 2015 and therefore has overpaid $262.62 on the Credit Card (Dkt. No. 72, Debtor's doc., p.2).   Debtor's claim is based on his own ledger listing payments from September 4, 2012 through May 7, 2015, as summarized in Appendix 2.  The payment interval is fairly steady, though not monthly, and is for irregular amounts which total $2,292.62 through May 7, 2015 ($1,667.62 through the February 19, 2014 Petition Date; $1,992.62 through April 22, 2014 when Michelle filed Claim 4-1).  Debtor's ledger is supported by a run of his own bank statements showing debits to Citibank (Dkt. No. 72, Debtor's doc., Ex. A). In fact, Debtor in his ledger fails to take credit for a substantiated $42 payment on October 21, 2013, making a total payment of $2,332.62 (including $1,707.62 as of the Petition Date).  Debtor made no payment from April 4, 2014 to May 7, 2015.

In response, on December 16, 2015, at Dkt. No. 77, Ex. H, Michelle filed Citibank Credit Card statements showing the following balances due on the following dates:

| | |
|---|---|
| February 3, 2014 | $2,872.10 |
| March 3, 2014 | $2,795.82 |
| December 3, 2015 | $1,656.85 |

(Dkt. No. 77, Ex. H, pp. 1, 12, 13).[12]  The statements provided by Michelle indicate that she

has not made new charges against the card and that new accruals are from interest and

occasional late fees.  For example, the December 1, 2015 Transaction Detail shows a balance

of $1,656.85 and *$0 available credit*, suggesting that the account was frozen as to new charges

(Dkt. No. 77, Ex. H, p.5).  Determining what Debtor owed on the Credit Card as of the

February 19, 2014 Petition Date[13] is complicated by Debtor's continuing post-petition

obligation to pay this debt which continues to accrue interest and late charges.  The Court

therefore finds that Debtor owed **$2,872.10** on the Citibank Credit Card as of the February

19, 2014 petition date (as reflected on the February 3, 2014 statement from Citibank), and

that **$1,656.85** remains due after giving effect to the Debtor's apparent post-petition

payments, as indicated in the December 3, 2015 statements referred to above.[14]  *After* the

application of that amount, and under the terms of the MSA, Debtor (individually) remains

liable for the Citibank Card until it is paid in full, regardless of whether Debtor elects to pay

it off in a lump sum or to continue to make periodic payments of principal, interest and late

fees as they accrue.

     13.  <u>Escrow Arrears</u>.  Michelle increased her demand for escrow arrears from $0 in

Claim 4-1 to $5,795.12 and decreased it to $0 again in Claim 4-2 (Dkt. No. 77, p.7, ¶ 10).  The

Court accordingly finds that Debtor's estate owes Michelle **$0** *prepetition* amounts due on escrow

arrears.

---

[12] This account ends in *1992, not in *1991 as provided in the MSA.

[13] By the February 19, 2014 Petition date Debtor had paid $1,707.62 against a February 3, 2014 statement of
$2,872.10 (a difference of $1,164.48).

[14] Proof of Claim requires credits for any payments against amount claimed.  *See* Official Form 410, pp. 1, 3 (creditor
required to acknowledge that "creditor gave the debtor credit for any payments received towards the debt").

## V.    MICHELLE'S DEMAND FOR COUNSEL FEES AND COSTS ON THIS APPLICATION

Michelle has demanded counsel fees of $16,723.50 and costs of $103.75 for the expense of defending this application (the "Fees and Costs"). The demand is accompanied by time sheets and certification of counsel (Dkt. Nos. 77, Ex. J, and 77-1), but is not supported by any citations to any applicable legal authorities. Instead, Michelle presumes and argues that, because the Court stated on the record on December 1, 2015 (and again in the Interim Order entered on December 10, 2015) (Dkt. No. 74) that all elements of Michelle's proof of claim are excepted from discharge under 11 U.S.C. §§ 23(a)(5) or (a)(15), the Fees and Costs are also allowed to be recovered from the estate and Code. Michelle's presumption does not follow from the Court's characterization of the elements of the proof of claim and is contrary to federal law.

Under the American Rule followed in Federal Courts, fees and costs are not awarded to the prevailing party in an action unless certain exceptions apply. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1967). The Rule arose to avoid discouraging claimants from filing suit under threat of bearing the whole cost of litigation and to avoid clogging the Courts with time-consuming computation of fee awards. *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718 (1967). The American Rule applies in Bankruptcy Court. *In re Fox*, 725 F.2d 661, 662 (11th Cir. 1984). The exceptions which allow the Court to shift fees to the "nonprevailing" party are:

(1)    a contract expressly provides for the payment of attorney's fees;
(2)    a statute expressly provides for the allowance of attorney's fees;
(3)    a "common benefit" is conferred by the recovery of a fund or property;
(4)    a party willfully disobeyed a court order;
(5)    the court makes a finding that the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons.

*Cityside Archives, Ltd. v. New York City Health & Hosp. Corp.*, 37 F. Supp. 2d 652, 656-57 (D.N.J. 1999) (paragraphing added and footnotes omitted).

22

In the instant case, Michelle did not make an express argument for fee shifting under the American Rule.  The claim evaluation process from Debtor's  October 1, 2015 application through the last submission on December 18, 2015 became attenuated and unusually complicated because both parties struggled to provide a satisfactory accounting for the monies due Michelle on the proof of claim.  The Court finds, nevertheless, that with respect to one element of the proof of claim, Debtor's obligation to pay $10,000 to Ms. Ullmann, Debtor acted in bad faith or vexatiously in persistently arguing that the Superior Court relieved him of his obligation to pay the fee while providing no plausible evidence that the Superior Court ever vacated that obligation.  For that reason (and because time sheets for Michelle's counsel do not disclose exactly how much time Michelle's counsel spent responding to that argument), the Court awards Michelle $1,750 in fees.

As to costs, Fed. R. Bankr. P. 7054(b)(1) states that "[t]he court may allow costs to the prevailing party except when a statute of the United States or these rules otherwise provides."  28 U.S.C. § 1920 enumerates allowable costs:

28 U.S.C. § 1920 ("Taxation of costs"):

(1)    Fees of the clerk and marshal;
(2)    Fees for printed or electronically recorded transcripts necessarily obtained
         for use in the case;
(3)    Fees and disbursements for printing and witnesses;
(4)    Fees for exemplification and the costs of making copies of any materials
         where the copies are necessarily obtained for use in the case;
(5)    Docket fees under section 1923 of this title;[15]
(6)    Compensation of court appointed experts, compensation of interpreters,
         and salaries, fees, expenses, and costs of special interpretation services
         under section 1828 of this title.

28 U.S.C. § 1920.  In the instant case, none of the $76.60 in expenses appended to Michelle's time sheets (for mileage and the expense of reviewing PACER) meets the requirements of 28 U.S.C. § 1920 (Dkt. No. 77, Ex. J).  In the body of her last response, Michelle seeks $103.75 ($3.75 for

---

[15] 28 U.S.C. § 1923 allows portion of docket fees to be in circumstances not relevant to this case.

23

parking which is not allowed under 28 U.S.C. § 1920) and $100 for copies of Superior Court

Orders, an expense which is compensable under 28 U.S.C. § 1920(3) or (4) (Dkt. No. 77, p.7, ¶ 10

and Ex. G).  Michelle is awarded expenses of $100 under 28 U.S.C. § 1920.

## VI.    CONCLUSION

For the reasons set forth above, Claim 4-2 for monies due and owing Michelle as of

the February 19, 2014 Petition Date is determined to be

| | |
|---|---|
| $  9,415.71 | Bank of America 1st mortgage |
| 1,864.68 | Bank of America 2nd mortgage |
| 276.34 | Homeowner's insurance |
| 900.00 | Utilities (Verizon and Verizon Wireless) |
| 580.81 | Electric bill |
| 104.77 | Optimum bill |
| 128.87 | Water bill |
| 10,000.00 | Counsel fee |
| 105.00 | Overdraft fee |
| 1,656.85 | Citibank Credit Card |
| $25,033.03 | Total Proof of Claim 4-2 |

Michelle is also awarded $1,750 in counsel fees and $100 in expenses for this claims allowance

process, which the Trustee shall also pay over to her from estate assets.

The claim allowance of $25,033.03 and fee and expense award of $1,850 are reiterated

in the accompanying implementing Order.  That Order will further direct the Trustee to disburse

the balance of the funds remaining in the estate in escrow to counsel for Michelle for further

distribution pursuant to agreement of the parties or further order of this Court or the Superior

Court, which shall have concurrent jurisdiction as to the disposition of the escrow.  The reason

for creating this escrow is because Michelle has established that: (i) the Debtor's obligations to

her under the MSA are nondischargeable; and (ii) the Debtor has failed to pay all or a substantial

portion of those obligations on a post-petition basis.  To preserve Michelle's offset and other rights

24

against those funds, this Court invokes its equitable power under § 105 of the Bankruptcy Code

and as a court of equity generally to create the escrow.

      An appropriate Order accompanies this Memorandum Opinion.

                                   _/s/Vincent F. Papalia_____
Dated: March 14, 2016                     VINCENT F. PAPALIA
                                  United States Bankruptcy Judge

## APPENDIX 1
## <u>FINAL ORDER ON CHAPTER 7 TRUSTEE'S DISTRIBUTION</u>

Re:   John V. Scully, Case No. 14-12881 (VFP)

The docket-number references on the right represent each party's most recent (or clearest) position on a particular expense:

| Line item | Claim 4-1 | Claim 4-2 | Michelle's Dkt. Nos. 73/77 | Debtor's Dkt. Nos. 67/72 | Ordered |
|---|---|---|---|---|---|
| BoA 1st mortgage w/tax | $    15,822.71 | $    15,822.71 | $    76,780.68 | $    9,415.71 | $    9,415.71 |
| BoA 2nd mortgage | 2,651.35 | 3,438.02 | 14,687.00 | 1,864.68 | 1,864.68 |
| Equity line of credit | 363.74 | 0.00 | 0.00 | ---- | 0.00 |
| Car insurance | 1,346.29 | 0.00 | 0.00 | ---- | 0.00 |
| Home insurance | 276.34 | 365.42 | 365.42 | Says "disposed of" 03/31/14 Order. | 276.34 |
| TV/Phone ("Utilities") | 750.00 | 900.00 | 900.00 Verizon 580.81 Electric 104.77 Optimum | Says all "disposed of" 03/31/14 Order. | 900.00 580.81 104.77 |
| Water bill | 128.87 | 128.87 | 368.00 | Says "disposed of" 03/31/14 Order. | 128.87 |
| Counsel fee | 10,000.00 | 10,000.00 | 10,000.00 | 0.00 | 10,000.00 |
| Other payments by Michelle | 4,168.05 | ---- | ---- | 0.00 | 0.00 |
| 2012 tax refund | 808.54 | 0.00 | 0.00 | 0.00 | 0.00 |
| Old fee (overdraft fee) | 105.00 | 105.00 | 105.00 | Claims Sup. Ct. denied. | 105.00 |
| Citibank credit card | 0.00 | 2,000.00 | 1,656.85 | (262.62) | 1,656.85 |
| Escrow arrears | 0.00 | 5,795.12 | 0.00 | ---- | 0.00 |
| Michelle Bankruptcy counsel | ---- | ---- | 16,723.50 | ---- | 1,500.00 |
| Michelle Bankruptcy expense | ---- | ---- | 103.75 | ---- | 100.00 |
| **Total** | **$    36,509.97** | **$    38,555.14** | | | |
| | | | | | |
| | PROOF OF CLAIM TOTAL: | | | | $    25,033.03 |
| | | | | | |
| | FEE ($1,750) AND EXPENSE ($100) AWARD TO MICHELLE FOR CLAIMS ALLOWANCE PROCESS: | | | | $    1,850.00 |
| | | | | | |
| | TOTAL DISTRIBUTION TO MICHELLE: | | | | $    26,883.03 |
| | | | | | |
| | REMAINING BALANCE TO TRUST ACCOUNT OF ATTORNEY FOR MICHELLE | | | | |

**APPENDIX 2**
**SCHEDULE OF DEBTOR CREDIT CARD PAYMENTS**

Re:     John V. Scully
        Case No. 14-12881 (VFP)

| **Payment Date** | **Amount** |
|---|---|
| September 4, 2012 | $    250.00 |
| October 3, 2012 | 135.00 |
| December 4, 2012 | 225.00 |
| January 3, 2013 | 225.00 |
| February 4, 2013 | 150.00 |
| March 5, 2013 | 125.00 |
| April 4, 2013 | 100.00 |
| May 31, 2013 | 147.62 |
| July 5, 2013 | 130.00 |
| September 4, 2013 | 80.00 |
| October 21, 2013 | 42.00[1] |
| January 6, 2014 | 100.00 |

**Subtotal Through February 19, 2014**          **$    1,709.62**
**Petition Date**

| March 4, 2014 | 125.00 |
| April 4, 2014 | 200.00 |

**Subtotal Through April 22, 2014 Claim 4-1**          **$    2,034.62**
**Filing Date**

| May 7, 2015 | 300.00 |

**Grand Total per Debtor's Exhibits**          **$    2,334.62**

---

[1] Omitted from ledger at Dkt. No. 72, Debtor doc., p.2 but evident in Dkt. No. 72, Debtor doc., Exhibit A, p.14, Debtor's bank statement ending October 23, 2013.